May it please the court, my name is Ted Stapovich and I'm representing Mr. Hereimi in this matter. Imad Hereimi is a man for the most part of his life lived the American dream who now finds himself convicted of crimes based on, as we have stated in our briefing, a lessening of the burden of proof and upon being denied an opportunity Let me ask you something about the first one. What you object to essentially there is a jewel instruction that the court gave. After Heredia, our en banc decision in Heredia, I don't understand where you can get traction on that. Could you relate your argument more to Heredia? Your Honor, it's solely based upon the finding of a high probability rather than proof beyond a reasonable doubt. That's solely the argument. But we approved a jewel instruction in Heredia. There were some dissenters who thought there shouldn't be jewel instructions. There are some judges who think so too, but that's neither here nor there. In that matter, I was kind of cool on Heredia myself. I wrote separately in it, but there were six votes. Yes, Your Honor. I realize that and I guess there's no way to state it to another than disagreeing with the en banc decision in regards to that. What can we do? It sounds like your attack is on the jewel instruction concept. I've written dissent in the past saying I don't think it should exist. Others have written dissent saying it shouldn't exist, but Heredia seems to have said it exists. If the court is bound by Heredia, it's bound by it. It doesn't mean that we have to agree to it or that it is, in our view, the proper approach to it. Is there anything you can ask us to do? If we are, in fact, bound by Heredia, does that end the question in terms of what we can do by way of decision? I wouldn't wring our hands, but I don't think there's anything beyond that. Anything that I could add to the dissents or to the positions? No, I don't have anything to add. Maybe this issue doesn't offer much for today. I would agree, but it is a position that we've taken and that we had taken throughout trial in the matter. Well, you can preserve it for review by others, but that's all you're doing is presuming. Yeah, that's probably essentially what we're doing here is preserving that. All right. What we're really focused, most of the briefing has been, and what we're focused in on is the 404B reverse application and the addressing of the denial of an ability to present a full and complete defense. As presented in the briefing, a number of circuits, the 3rd, 5th, 7th, and 10th, have considered these issues and, in our view, presented an enlightened approach to the issue. Counsel, look. Let's assume, just without saying too briefly, let's assume that the evidence should have come in. Let's just assume that for the moment. It looks to me like there was a tremendous amount of evidence in that showed this, not your client, but Mr. M. It's Mr. Maud. Was a manipulative crook. Plenty of evidence. That's his reputation. He's been prosecuted for it in the past. Plenty of stuff about what he does and how he misleads people. So, assuming this piece was kept out improperly, doesn't the jury have plenty in front of it to reach that conclusion? Or is it harmless? Not in our view, Your Honor. And that is that the prior instances were instances that were very similar to the present. And that is where Mr. Maud had, in the first instance, in fact, had become a member of the family. This is a situation where you have two immigrants that fall in with each other over a house project. It was described doing the marble on the floor. And Mr. Haramee had basically taken this person in like a family member. The prior instances, the first one, dealt with and would have been testified to by Mr. Maud's ex-wife in regards to the circumstances of an embezzlement, et cetera, at that time. The second instance was. Where you frauded a family member, right? Yes. Well, actually, they weren't married at the time. He frauded. Yeah. But he pleaded the call kind of like a family member. He defrauded that person. Right. It was his father-in-law in that instance. Right. The second instance was an actual where he went to work in Anchorage. After the first incident, he cut and ran to Alaska at that particular point and then worked for a number of years in a men's clothing store where, once again, he was treated like family. And he embezzled from his employer. Yeah. Clothing as well as money. And at that time, he cut and ran. The evidence would have shown he had gone to London, England at that time. So here he actually did embezzle from his employer again. But he did not embezzle from Mr. Haramee, did he? No, he did not.  He made Mr. Haramee part of his scheme. Right. Unknowingly, maybe. Yeah, that was our point, and that's what we were presenting to the jury, that Mr. Haramee, as with everybody else, was taken in by this individual and his charm, his supposed helpfulness, such that he believed that everything that was occurring was on the up-and-up, that there wasn't this state of mind. If, in fact, Mr. Maude breached his duty to the state of Alaska by failing to disclose his involvement with Horizon Graphics, Mr. Haramee did not know and was not aware of that duty. And that was the main gist of the defense and of the evidence that was presented at trial in this matter. Counsel, it looked to me, when I read over the way the district judge was ruling, as though what he was saying was he'd already proved that Maude is a very sleazy, dishonest, deceptive, manipulative guy. Plus, the jury could see for itself that he's not sitting in the chair there, as he should be. And you also had – was this before or after all the papers revealed his dramatically dishonest scheme after September 11? This was after. After, so it's unimaginable that there was anyone in Anchorage that didn't know what kind of a crook Maude was. That became apparent during jury selection. Everybody pretty much knew who Maude was. You had your case even before you put it on, as far as him being a really sleazy guy. Now, the issue was knowledge. And what the judge said was that there'd be a trial within a trial to find out whether Maude really did embezzle from his prospective father-in-law and whether he really did embezzle from the clothing store. And district judges have a lot of discretion over consumption of time and confusion of the jury on these trial-within-a-trial things. And the real issue anyway was knowledge. Did Haramee know that he was part of a scheme to steal corruptly from the state on these printing contracts? Or was he just another of Maude's victims? And I don't quite understand why the district judge abused his discretion in saying, well, jury already knew what kind of a guy Maude was. This doesn't go directly to Haramee's knowledge of what kind of a guy Maude was or that Maude was using him, and it's going to consume a lot of time and create a lot of confusion. Your Honor, one is the way I looked at it, it wasn't going to be a trial within a trial. The two witnesses were going to come on, and basically his wife and his daughter were going to come on and state what they knew in regards to these facts. I don't know. It seems like weaker rather than stronger evidence because, my gosh, you want to hear something bad about somebody, ask his ex-wife. Well, Your Honor, this all comes back to what was Maude Haramee's state of mind. Did he know that Mike Maude was somehow failing to disclose his relationship with Horizon Graphics? I mean, this was not a case where the state paid for something and didn't get it. They paid for services. The issue was could they have got it cheaper or not? There wasn't any theft. There wasn't any embezzlement. It was the letting out of these contracts. We understand that. The problem is Donut Shop doesn't have printing equipment, so they farm it out to a real printer and they just take a markup on it. Just like any other print broker does. There's nothing in markups. Markups weren't an issue as to whether it was a fair markup or an unfair markup. What the issue was, was Maude giving out contracts to Haramee, and did Haramee know that Maude wasn't allowed to do that or what was going on here? The evidence that really mattered in this case was the truck, the pickup truck. As I recall, Haramee bought a truck, delivered it immediately to Maude. Maude bought some kind of add-on for the truck. Maude was keeping the truck. Why would this Donut Shop owner buy a truck for a fellow? He didn't buy the truck for him. This was a truck that he had bought, and as the evidence was shown, and it's in the briefing here, they were talking about getting into a construction business down the road. Maude, the truck was purchased by Haramee. Maude's son or child got in an accident and had damaged the car. And this is all within three or four days, the purchase and the possession by Maude. Haramee did not know about any ordering of any parts for it. He did know about an ordering of a keyless lock for it because he had been approached by Maude. But once again, it's treating this individual like family. He had a problem, and Haramee was going to help him with it. That was the approach to the truck. The truck was cast in a sinister light because it was at the house at the time that a warrant was searched. I think it was for a probation search, actually, at that particular time, then turned into a later search. So I've never viewed it, and I know it was cast that way, but I've never viewed the truck as being the linchpin in this case as to the approach. Did you want to save any time? Yeah, I'll go ahead and save time. Counsel? Good morning. My name is Rhetta Randall. I'm an assistant U.S. attorney from the District of Alaska. I represent the government in this case, and I prosecuted this case. First, to correct just a couple of things, Mr. Maude never gave contracts to Mr. Haramee. Mr. Haramee did nothing more than receive the checks from the State of Alaska and put them into the bank account that he had set up in the name of Horizon Graphics. Mike Maude created these contracts, and through self-dealing, got the contracts performed as a state employee, and then the money for those contracts went straight to a bank account in Mr. Haramee's name. Now, why Mike Maude, who was a respected, at one point in time, but very successful businessman, would let the profits or the money from his business go into someone else's bank account that he had no access to was one of the questions, I think, that could be raised in terms of the deliberate ignorance in this case. Also, the truck was brought from the proceeds that were made from Horizon Graphics. There was a check ledger. The only thing that Mr. Haramee claimed to do was keep the check ledger. He kept a record of all the checks that came in, and from that, $5,000 from those proceeds went to purchase this truck. This truck, by Mr. Haramee's testimony and his initial interview by the detective when he called asking for the return of the truck, before Mr. Haramee knew he was under any suspicion, he said was going to be used in the construction company that he and Mike Maude were going to create at some point in time. Now, there's no dispute at all that Mike Maude had committed honest services fraud. There was not any dispute by the parties. I would just briefly address the reverse 404B. I think Judge Singleton's biggest problem with that was that it was basically hearsay and it wasn't admissible. The two people that were testifying were not personally involved. They had heard about these incidents from the relatives, but the actual victims were not available to testify. None of the original people involved were even available, so I think the hearsay was one of his problems. And then he also made a 403 finding that the relevance was outweighed by how cumulative, misleading, and confusing it was. The two people who were testifying were not the victims of these specific incidents from 1981, and I think it was also how old the incidents were. They were from 1981 and they did not even occur when Mr. Haramee had his relationship with Mr. Maude. The hearsay point, let me ask you to pause on that, because was there doubt that the two proposed witnesses had personal knowledge of the events? I mean, they may not have been the individual defrauded, but were not they in a position to talk about it? The ex-wife, perhaps, the daughter, I think that would have been hearsay upon hearsay. I think she just heard it as part of past history. It was very unclear because there was no actual proffer put on as to who and what these witnesses would testify. I think it was the age and how much other evidence. The judge says, I assume the hearsay problem could be gotten around, but the 404 problem is more difficult. I don't understand why you're focusing on hearsay. It was just addressing that issue. I was reading from Judge Singleton at excerpt 50, line 6 and 7. Okay. That was the objection. I didn't actually see why I focused on that. Okay. I apologize. It's the relevance in the 403 issue that I also think that the judge was justified in finding. Let me pause there. How is it not relevant? I think it could have been relevant. It's just that it was sold in time. It wasn't something that Mr. Harimi knew about at the time he formed his relationship with Mr. Mon. That's sort of the point. The whole point here is that Harimi alleges that he was duped. He was convicted of aiding and abetting. He has to have a specific intent. He just claims the intent. And to be honest, the problem I've had looking at this case is largely demonstrated, I think, by the sentence that was imposed by the court because after this long trial, the result turns out to be a sentence of probation and a relatively modest fine, which suggests to me that Judge Singleton, while sustaining the verdict, didn't think there was a real powerful case of wrongdoing on the part of Mr. Harimi. Oh, I disagree. I'm sorry. I didn't mean to interrupt. No, I understand that. I inject an additional thought, and I look at this, and I don't know the particulars.  I didn't read the whole transcript for that purpose. But I do say, gee, the theory of the defense, at least, sounds plausible. Maude's duped lots of other people. He duped me, too. I want to prove that he's got this great capacity to dupe people by what he's done in the past, and I can't do that because the judge won't let that in. I think that there was so much evidence about the reputation of Mack Maude and what a con artist he was and how much he had duped people that the two incidents from 1981 were just so outweighed by that. Could you list? Just briefly in terms of the sentence, Mr. Harimi was really the sole person who runs Golden Donuts. It had been in existence for quite a while. He has bakers that come and go, but he's the main employer, and I think the sentence of probation was not to shut that business down and to keep Mr. Harimi in business. The amount of the fine was equal to the amount of restitution. That's why Judge Singleton said it in that fashion, to provide the punishment. Counsel, could you list all the other evidence that came in to show the defense, as Judge Clifton well stated it? For showing that? What else was there so that this wasn't necessary to show that Maude? What made this cumulative? Basically, you're saying they already had enough evidence on this. This additional evidence wouldn't have mattered. Well, what evidence was there that Maude was good at duping people? During the initial search information, I had to prove the honest services fraud itself. So the fact that Mike Maude was on probation for having been convicted of a fraud came out, and his probation officer testified as to what the requirements on probation was for a certain extent and why they had to do the search to begin with. They thought he was using credit cards without telling the probation office. So throughout the trial initially, there are things Mr. Harimi is not even telling his probation officer. Number one, that he got credit cards without permission. Number two, that he was on probation, and his probation officer testified that Mr. Maude didn't tell us about these credit cards that we thought he was using that the detective had found out about. He didn't know about this truck. When they went to stop him and tell him about the search of his house, he was at work, and he had the truck with him. They didn't know he was driving this vehicle. They had no idea that he had other income that he was making, even though it was being deposited into Mr. Harimi's account. There was information from Mr. Harimi himself that Mike Maude had told him he had been convicted of a felony of bankruptcy fraud. He did minimize it. He claimed that he had not checked the proper box and the feds had come after him, so there was the sympathy given Mr. Maude, but there was also the fact that he did have a felony conviction.  He had certain rules he had to follow. He could not take out any kind of extra loans or debt without the permission of the probation officer. That came through Mr. Harimi. Also, Mr. Harimi did put in witnesses who testified that Mike Maude had a bad reputation in the community. He was known for being dishonest. Even his daughter, Mr. Maude's daughter, testified that her dad had a very bad reputation in the community, and the ex-wife did. As I recall from the newspapers, if not the case, after 9-11, Maude vandalized his own shop with anti-Arab slogans and then called the police and got a lot of publicity and he got a lot of contributions, charitable contributions, from people who felt bad that somebody in Anchorage should be a bigot. Did that come out in evidence? That came out during voir dire. It came out in voir dire? Yes. But not in evidence? No. It came out in terms of Mr. Harimi's testimony. I did not bring that out in my case in chief. Mr. Harimi... I didn't ask whether it came out in the case in chief. It came out in Mr. Harimi's testimony. Hold on. Listen to the question. I didn't ask if it came out in the case in chief. I asked if it came out in the evidence. The voir dire isn't evidence, even though it tends to show what the jurors already know coming in. I want to know if it came out in evidence. From what I recall of Mr. Harimi's testimony, he talked about Mr. Maude telling him about the 9-11 vandalism and that he was part of the bridge builders' community and that that's when the community had turned against him and was turning against Muslims. Whether specifically... I believe he did also say that Mr. Maude was investigated for vandalizing his shop and they couldn't prove that, which is true, and that instead they charged him with getting these loans and falsifying the loans. I believe that's how Mr. Harimi explained what Mr. Maude told him. Let me ask you, the whole argument that evidence is not necessary because there's lots of other evidence before that is cumulative. I have to say, in my mind, I'm cautious with that in cases where the jury's result suggests that it wasn't persuaded of something. In this case, the defense may have failed to persuade the jury that Maude was such a successful con man or the jury may have believed the evidence that you put on. Starting with the premise, everybody knows that Maude's not to be trusted. What evidence was there specifically pointing at this defendant to demonstrate that this defendant did have specific intent, did have sufficient awareness of what Maude was trying to do, how Maude was defrauding the state, such that this defendant had the specific intent, should be held culpable? I think that the biggest thing was Mr. Harimi describing himself as a meticulous businessman and being a perfectionist. He had a very successful business. Mike Maude was a businessman and very successful. However, and this is one of the things I think is unique about this case in terms of the deliberate ignorance instruction, they both sort of created their own defenses. Mike Maude's defense was that as long as I don't get paid, this is not going to be a problem. That is what Mr. Harimi claimed he told him. So they both had, I didn't get paid, I wasn't responsible. Mr. Harimi, knowing, knew Mike Maude was a state employee. He admitted that on the initial interview when he was recorded. And it's an obvious conflict of interest to set up contracts for yourself that you're going to get the benefit from. But even, let's say, Mr. Harimi thought that Mike Maude could get these contracts and he could get the money from it and he would let him set up Horizon Graphics. And even if he'd agreed just to get the business license, then maybe he didn't have the specific intent. But they did a lot more smoke and mirrors. There was different levels of secrecy in this direction through everything they did. Mr. Harimi not only set up the business license, but he set up the way to get the pay for those printing jobs so that no one in Mr. Maude's employment knew who was getting those printing jobs. He got the Horizon Graphics line of credit and debit card to pay for those printing jobs. Mr. Maude created invoices totally on Horizon Graphics invoices. There was no indication that any of those contracts came through Mike Maude. Mr. Harimi arranged to keep all the finances and never questioned him too much. All these documents that had to do, or many of the documents for Horizon Graphics, came to the Golden Donuts business because that was a post office box used for Horizon Graphics and that was the telephone number used for Horizon Graphics. So a lot of the money from the post office box, a lot of the documents, came to Mr. Harimi. The only thing Mr. Harimi really focused on, he claims, things even in his business, he claimed not to look at when Mike Maude was listing himself as general manager of Horizon Graphics, which obviously he's a state employee, so he can't be a general manager. Mr. Harimi claimed not to see those documents that were in his business, but every single state of Alaska check that came through, Mr. Harimi endorsed and deposited in the bank account. Mr. Harimi had total control over that. He used that money to make sure that the balance was always in positive because he worried about his line of credit, but he never questioned Mr. Maude as to how he was spending the money. Mike Maude used a debit card or credit cards, Horizon Graphics credit cards, drawing on this bank account that was totally funded from these contracts to get the supplies to pay for things that they needed. But that was all in Mr. Harimi's name. Now, Mr. Harimi, as a meticulous businessman who's very concerned about his line of credit, lets this person who he claims duped him, who he knew had a felony, doesn't question any of that. And he basically is just holding this group of money because they're going to create a construction business from this group of money. Now, if this was up and up, if it wasn't a problem, why wasn't it a partnership? Why wasn't Mike Maude's name on everything? And I think that's the thing that gave the jury pause. Mr. Harimi, on one hand, is this perfectionist and meticulous businessman, and on the other hand, he's only paying attention to the money, but he's not worrying about anything else that could possibly damage his reputation in the community. And what they're waiting for is Mr. Maude to get off probation. He was soon to be off probation. Then he was going to quit his job as a state employee, and they were going to go into business together using the money that they made off the state of Alaska to start Horizon Construction. The other thing... Thank you, counsel. Okay. Thank you. Counsel. Yeah, just very briefly. It's our point, and it was a point at trial, too, that Mr. Maude played on 9-11, made claims of discrimination to Mr. Harimi, a man of Palestinian descent, something that Mr. Harimi believed to be true based upon what he had been told by Maude. He treated Maude as a brother. He did not question. I think his statement was, and I'm not sure exactly where it came out in trial, but he did not question his brother. He trusted him. He let him work in his house, all these things, and he testified to it. There was a statement made during the course of trial that Mr. Harimi agreed with, that Maude had told him, and that was that if this had been John Smith, white John Smith, that there wouldn't have been any prosecution for this bankruptcy issue or the failure to disclose. So all these things were played upon, and the earlier evidence, once again, how that ties in is, once again, playing on these close familial-type relationships, developing trust, and then, in the end, burning the very people that put the trust in him. So that's all I had to add. Thank you, Counsel. United States v. Harimi is submitted.
judges: Fernandez, Kleinfeld, Clifton